We'll hear our argument next in Appeal No. 06-1338 O2 Micro Intl v. Monolithic Power. Good morning, Mr. Bagatelle. Welcome to the Court. We're ready to hear your argument. May it please the Court, Dan Bagatelle on behalf of Appellant Monolithic Power. Given the time constraints, I'd like to focus on two issues. First being MPS's entitlement to a new trial on validity of its patents. And second, whether O2 was entitled to the damages on its great secret claim. If I may start with a new trial of anticipation. Our position is that the trial of the validity of MPS's patents was fundamentally unfair because O2 was permitted to blindside MPS with an undisclosed reference that became a centerpiece of its invalidity case at trial. We're not asking for JMAW. We're asking for a new trial that's fundamentally fair. To begin with, there's no doubt that O2 did not comply with Section 282 of the Patent Act or the Patent Local Rules. They did not disclose that they were going to rely on this reference in any way. There were numerous disclosures, expert reports, 282 statements. It just was not there. Well, the problem is that you only made two objections. The District Court said that you didn't get the kind of definitive ruling that's required under Rule 103A. And we are in the record. Do you think that there is language from the District Court in ruling on these two objections that constitutes a definitive ruling? I had a hard time finding that. Okay. I think we should focus on the Moyer testimony because I would agree with you that the Lynn ruling and testimony was a little bit of brutal, which is exactly why MPS continued to object the second time. And what happened was O2 suggested that it wanted to show that nothing that MPS had done was different from what was in the prior argument. And that is exactly what the District Court allowed O2 to do. We objected on grounds of non-disclosure, and the District Court overruled that objection. And her ground was that Mr. Moyer was somehow deviating from the Court's claim construction and that he had opened the door to that. That actually was untrue, and I think if you look at the District Court's own claim construction, and that's at 593 and 603 of the record, you'll see that MPS had argued all along that the patent required that it act or near residence. But I'm confused as to what the bearing of that is on this. As I understand Rule 103, there's got to be a clear ruling by the District Court saying that this treatise or textbook was admissible for invalidity purposes. And I'm not finding that ruling either on Moyer or on Lynn. Okay, let me explain it with respect to Moyer. The purpose for which it was admitted was to show that MPS did nothing different from what was in the prior art. What I'm looking for, and perhaps I'm looking for the wrong thing, is where the judge said, I'm going to overrule your objection. I think this textbook is admissible for invalidity purposes. She did not say that expressly. What she said was, I'm going to allow you to make the argument that MPS did nothing different from what was in the prior art. That's what O2 offered to do, and that's exactly what O2 did do. In fact, later on in the trial, they did the exact same thing with Professor Erickson and Brockers, and in the closing argument. Essentially, once the cat was out of the bag, there was no putting it back in. And they really continued to do the exact same thing. So exactly what our objection was to Moyer was the same objection that we had going forward. And there really wasn't anything we could do to put the cat back in the bag. We objected to letting it out in the first place. Now, she also made two other arguments for why she declined to award a new trial. One was that it was better as an obviousness reference than as an anticipation reference. Well, in fact, that may be true, and we don't know why the jury found anticipation but not obviousness. Nevertheless, it's very clear from the record that O2 argued for both anticipation and obviousness. That's clear from the Moyer testimony, in which they essentially argued that it was not novel. And it's clear from the closing argument where they expressly argued that it was not just obviated but anticipated. So the third point the district court relied on was its jury instruction. And the jury instruction, the history of that is that MPS actually asked for an instruction to try to ameliorate the damage that had been done. We asked for an instruction that said identify what is and what is not an anticipating reference and have the jury identify any anticipating reference on the jury verdict form. And the district court did the first but not the second. And actually the instruction was simply the prior art references you may consider are Henry, Cosby, and then Clark, which was an obvious instruction. Now, the attempt to deter Mr. Johnson from arguing that in closing didn't work. In fact, it became the centerpiece of the closing argument. The focus was on exactly what Mr. Moyer had said. Mr. Moyer said, here's what I think is novel, X, Y, and Z. And Mr. Johnson pointed out that on the fly Mr. Moyer was unable to explain why none of that was not already present in prior art reference, meaning the Erickson textbook. And then they expressly argued later on that it was anticipated. So I don't think it's fair to assume that the jury hewed to that one little line in the very long jury instructions. We're talking a complicated trial on multiple issues, including trade secret issues. And simply assume that the jury ignored what O2 argued first in the case in this opening, what it stressed all the way through trial, and in its closing argument. It's just not realistic to assume that it had no effect. And we think under Ninth Circuit law you have to presume that there was an effect and that they have not provided that presumption in this case. I thought we had to presume that juries do follow the instructions of judges, unless proven otherwise. That's true. Well, there are two lines of cases. One is that you have to prove prejudicial error. And then there's the other line saying that we presume jury instructions are followed. And I've just given my best shot at why I believe it's not fair to assume that in this trial that the jury ignored the entire focus of O2's validity case. We had two other references on anticipation that were both had testimony that they were both anticipatory references, didn't you? That's correct. Why shouldn't we presume that the jury looked at those references instead of the Erickson text? Well, my first response would be, why would O2 have introduced the Erickson textbook in the first place if those two references were pretty strong? That is exactly why O2 introduced them, because they weren't comfortable with their position on Cosby and the Henry patent. In fact, the district court itself found that Cosby was so marginal that it wasn't even material to patentability. That's how weak that reference was. And Henry was a very, very different approach. He wanted a low-quality circuit that didn't operate at resonance. So these were very difficult anticipation arguments. They didn't move for Jamal. They didn't move for summary judgment on these, and that's why. So I don't think we can assume the jury found that, especially when the very first thing they argued at trial and the very last thing they argued at trial was the Erickson textbook. You did not object to the later references to the textbook, then? No, Your Honor. As I mentioned in response to Mitch, I utilized Rule 103. And essentially, as I mentioned earlier, what O2 was doing later on with respect to Dr. Erickson's testimony and with respect to Dr. Brockford's testimony was exactly what it had done before. This was essentially the same purpose. For example, if MPS had opened the door in some way, which we submit that we did not, it would have been the same answer. Moreover, the district court had already made a ruling that you can't show anything to the jury that's not admissible. And in fact, essentially, her ruling allowing that to come in was already determinative of the fact that she was going to allow it in. At that point, it was a mere formality. Everybody realized that it just hadn't been formally admitted to the record. But as Mr. Johnson pointed out at trial, by this point, the jury had seen it an awful lot. The belt had been run. If I may, in my remaining time, turn to the trade secret damages issue. And our threshold argument there really is that there wasn't any commercially significant use of the transformer trade secret that could justify any sort of damages. Now, there was a tribal question of fact as to whether MPS improperly acquired material relating to O2's transformer secret. But there wasn't any evidence that MPS actually used that information in any way that would benefit it or harm O2. The testimony and the documentary evidence showed that MPS got the information, did a little bit of experimentation in the laboratory, and then calmed down and realized, you know, our customers, which are the board makers, know a lot more about transformers than we do. But the restatement says that using it for research and development is sufficient, right? Not quite. What it says is to assist research and development. And there is a legion of cases that we have cited in our brief which basically says that dead-end flirtation with a trade secret that doesn't go anywhere doesn't amount to use and that's under both the restatement and general common law. There's no real deviation there. And O2 really hasn't come up with any contrary cases. We're happy to live with the restatement test, you know. Well, what about the Telex case in the 10th Circuit? You know that one? I'm not familiar with that one, but I don't recall any cases that have been cited in the brief which show that a use that doesn't end up being used in any affirmative way can amount to something that can award damages. Yes, it might support an injunction telling you, don't do anything further with it. But in this case, the district court found, this all became public four years ago, there was no ongoing benefit to NPS denying an injunction, and O2 hasn't appealed that ruling. So the question is whether a dead-end experimentation in a lab and you stick it in your drawer can amount to some unjust enrichment. They did not argue here, your Honor, that this was a negative trade secret. They argued this is a positive thing, this is a good thing. You should use the transformer technology. And NPS didn't use it at all. They basically just said, well, let the board of manufacturers decide what transformers to use. Now they did cite two pieces of evidence. And I do want to address those directly. It looks like I'm running a little bit short on time here. But first was the data sheet that listed the numbers CIU-HA-D43. And the short answer to that is you can't treat a trade secret like a nose of wax any more than you can a patent claim. And the point here was O2 itself argued that the name itself doesn't mean anything because, in fact, names CIU-HA-D42, et cetera, had already been appearing in public catalogs a year earlier. NPS was already using things by that name. What they said was that's just a generic definition. It doesn't tell you anything. So the real question is, was it on the actual board? And there was only one set of evidence with respect to that. And that was boards for NPS's prior generation 1010 product. All of the evidence with respect to that showed that those boards were created back in the first quarter of 2000. What do we have? We have Sumida's specification dated February 2000. We have a handwritten note from NPS saying we received it in March 2000. We have the boards themselves with chips that were dated January and March 2000. We have NPS witnesses who said we saw the boards in our offices that we vacated before July 2000. If every witness in every document says the light was red, the jury is not entitled to find that the light was green. There simply was no evidence whatsoever that NPS encouraged customers to use O2's trade secret, much less that any customer actually did so. If I may reserve the balance of my time for rebuttal. Thank you, Mr. Buscemi. Thank you, Your Honor. May it please the court, Peter Buscemi on behalf of O2 Micro. I'd like to begin by correcting a couple of misstatements that I'm sure were accidental. First of all, the instructions to the jury on the subject of the anticipating references were quite clear and there were in fact two of them. The first one appears at page 4384 of the joint appendix and the court instructed the jury in the following words, the only, I believe Mr. Bagatelle left out the word only, prior art references that you may consider are the Henry, Cosby and Park references. And then on the next page in the joint appendix 4385, the court informed the jury the prior art references upon which O2 Micro relies are the Henry, Cosby and Park references. So the court's instructions were quite clear. They were instructions that were requested by NPS and NPS of course made no objection to it. So there was no dispute about what the prior art references were that the jury could consider or on which O2 Micro was relying. Now, Mr. Bagatelle has, I think, abandoned any suggestion that there was something in the Dr. Lynn testimony that resulted in an objection and a definitive ruling by the court in which NPS could rely under Rule 103. I think that's correct and we've cited that testimony for the court to take a look at in Dr. Lynn's direct. Dr. Lynn was talking about the time when he was a student at the University of Arizona and he reviewed an earlier version of the Erickson textbook and of course as the court is aware, there were suggestions, not just suggestions, there were claims that O2 Micro was infringing the NPS patent. So it was perfectly reasonable for Dr. Lynn to testify about how he came to develop the O2 Micro controller. So I don't think we need to pause on that any longer. Now, let me turn briefly to the cross-examination upon which NPS's entire argument depends. First of all, NPS ignores the general proposition in litigation not limited to patent cases that one can cross-examine a witness with respect to a wide variety of materials, not necessarily materials that have been previously disclosed. So that Mr. Moyer, who was the NPS, one of the three co-inventors listed on the NPS patents, had just testified about what the nature of his invention was, what was so unique about it, what he had done that was a good thing. And it was in response to that testimony that the Erickson textbook and the diagram in the Erickson textbook was shown to Mr. Moyer and various features of the diagram were pointed out and we wound up with two lists that looked very much the same and that was valid impeachment wholly apart from any designation of the textbook as prior art. Now, I might say that these colorful references to ambushing are really out of line here for a variety of reasons. First of all, the Erickson textbook and both editions of the Erickson textbook, not just the second edition but the first edition as well, both editions of the Erickson textbook were listed on the exhibit lists of both parties. So NPS listed both editions and O2 Micro listed both editions and those exhibit lists are in the joint appendix at 67-23 and 24 and 67-28. So they're all there. Was the Erickson textbook ever part of the invalidity contentions under the Northern District rules? No, Your Honor. We did not cite the Erickson textbook as a prior art reference for anticipation. Then how do you justify the argument to the jury that seemed to suggest that the Erickson textbook was an invalidating prior art reference for anticipation? Your Honor, I think that the key point to understand on that score in response to your question is that the Erickson textbook talked about the cause of the article and so it was very important for us to bring the Erickson textbook to the jury's attention because it was written long before the litigation. But that's not what happened. You argued that it was anticipatory. I mean, you know, the closing argument was improper, right? There's no question about that. Well, Your Honor, I don't, you know, in a lengthy closing argument, I suppose you can find a sentence or two that you would object to, but there was no objection here. There was no objection at any one of the number of points. Well, that's a different question. I think you're on thin ice when you're arguing that the closing argument was improper. Well, let me just read part of the closing argument which has not been brought to the Court's attention by MPS. And I'm reading from Joint Appendix, page 4398. In short, Cosby, which Dr. Erickson described in his book years before this lawsuit ever started, has everything but the burst mode, and Henry has even the burst mode. But more than that, when you're thinking about secondary considerations, this was known it was being taught at the time. And earlier in the argument... I'm sorry, later in the argument, at page 4414 of the Joint Appendix, there's another reference. When he told you about Dr. Erickson's book, Dr. Erickson's book shows the same invention before they invented it, and you have an absolute right to consider that for purposes of whether there was an independent development. So that was made explicit to the jury. Now, there may be sentences that MPS picks out that they prefer to focus on, but the fact is there was no objection, there were the instructions, they got the instructions that they asked for, and as Chief Judge Michel's question earlier suggested, this Court and others presume the juries follow rather than depart from instructions. Is it true that in the opening, the Erickson textbook was also discussed as if it were itself an invalidating prior art reference? No, Your Honor, I would take issue with that. The relevant page is page 3890 of the Joint Appendix, and if one looks at page 3890, one will see that the Erickson textbook is mentioned, but it's mentioned immediately before the prior art references of Cosby and Henry, and it is promised to the jury that Erickson will testify about Cosby and Henry. I'm not talking about Erickson's testimony, I'm talking about his textbook. Yes, here's what the opening said. Now, in the book, I'm reading from 3890, now in the book he made reference to a particular piece of prior art, and here it is, number three, that is an article written by Melvin Cosby and R. M. Nelms. That piece of prior art discloses all of the claims of the 814 and the 881. Not only that, we found the first page of this article, that's the Cosby article, in the files of MPS. Was there some dispute about the date of the Cosby article? No, Your Honor, not to my knowledge. Then what was the need to cite the Erickson text to prove that the Cosby article predated the Erickson text? The Cosby article has its own date. You don't need a textbook to prove the date of the anticipating prior art publication. Your Honor, I think the answer to your question is that MPS denied, and denies to this day, that Cosby and Henry were anticipating references. That has to do with whether they show every claim limitation. But you explained, I thought, that the reason, the justification, the logic, the foundation for referring in the closing argument to the Erickson textbook was in order to show that the Cosby article was indeed prior art because it was prior to the invention in question. And I don't understand how that makes any sense because the Cosby article's date is self-evident. You don't need a textbook discussion of a prior article to establish the date of the prior article. I apologize, Your Honor, I didn't make my point clear. Let me try to do so. The point is not the date of the Cosby article, but rather that Professor Erickson, before this litigation began, had written about the Cosby article and had discussed what the Cosby article showed. And he had even drawn a diagram to illustrate what the Cosby article showed. And his diagram that he wrote back then was consistent with the testimony that he gave at trial. So it showed that his interpretation of the Cosby article as an anticipating reference was not ginned up for purposes of the litigation. Your Honor, I would like to turn very briefly to the second point that Mr. Bagatelle discussed because I think, again, there is an inaccurate description of the record. Now, we've gone through a lot of this in our brief, and I'll try to leave as much as possible to the brief. But there was substantial evidence that supported the jury's verdict of misappropriation and use and unjust enrichment for MPS. Let me just summarize it very briefly. What MPS... The principal flaw in their argument on this score is that they continue to misstate the issue, and they want to assume that factual findings have been made in their favor when, in fact, the jury has made factual findings against them and all reasonable inferences from the evidence in the record need to be drawn in favor of those findings. Now, here's what happened. We know that in the fall of 2000, MPS was having serious problems. There's evidence in the record. The e-mail traffic is reproduced in the joint appendix that customers had complained that there were difficulties with the transformers. Their own people testified that they were struggling constantly with the transformers, even though they didn't make the transformers. They went to the transformers... The point of all this is to refute what Mr. Bagatelle said? Yes, Mr. Bagatelle said... So you're still arguing against his appeal? You're not into your cross appeal? Well, our cross appeal relates to the unjust enrichment of war, which is on this same point. In other words, they say we're not entitled to any ruling in our favor at all with respect to our trade secret claim. So you're arguing both, then, against his appeal and in favor of your cross appeal simultaneously? Well, I haven't yet gotten to the damage portion, Your Honor, but I am trying to say... And I'll cut it short for the court. I'll say very simply that there is substantial evidence in the record that they got our data sheet in September of 2000. They got data produced by our demonstration board in early October of 2000. They actually got our demonstration board later in October 2000. They admitted that they looked at it. They admitted that they tested it. They admitted that they did various experimentation. And then they just declare that it was all a dead end. Well, the jury was entitled to disbelieve the statements of their witnesses that it was all a dead end because the jury was entitled to... I'm sorry, Your Honor? Suppose the jury concluded that it was a dead end. Can you recover for dead end work? Our argument is not that we can, Your Honor, but we have... So you agree that you can't recover for dead end work? Yes, Your Honor, except to the extent that if what Mr. Bagatelle means by dead end work is work that enabled them to expedite their development of a further transformer, we would not characterize that as dead end. So there may be a definitional problem. But if the work produced no benefit whatsoever either in eliminating possibilities or in leading them to a correct solution to the problem that they had, then I don't think recovery would be warranted. But we know, or the jury certainly was entitled to draw the inference based on the evidence in the record, that that's not the case. What was the instruction on this point? Well, I think there's no complaint about the instruction, Your Honor. But I'm wondering what it was. Well, I don't recall the precise words of the instruction right now because there was no complaint about it. I didn't focus on that in preparing for this morning. But I believe the instruction was that the jury had to find that MPS was unjustly enriched by its misappropriation of the O2 micro trade secrets. In the alternative, they could have found that O2 micro lost profits, but they made a finding that O2 micro did not lose profits. They made a finding that MPS was unjustly enriched. And the basis of that was that we knew they had all these commercial problems. We knew that major customers like Dell and Acer had approached us about potentially making orders for hundreds of thousands of our controllers. And we knew that after they did their adjustments to their own transformers, their customers decided to stick with their product. Thank you. Thank you, Your Honor. Mr. Bagatelle, you have about two minutes on rebuttal. I'll try to tick off a couple of points very quickly. First of all, Mr. Buscemi argued that one can cross-examine on a wide variety of materials. That's essentially counter to the premise of Section 282 of the patent. What were the rules? You can't say that with any reference. The second point was that the Erickson text was on the exhibit list. The Erickson text was on MPS's exhibit list because it was relying on the second edition to prove an aspect of its infringement case. It also relied on the first edition to show that certain transformer features were in the prior art. None of that was noticed that O2 was going to rely on the first edition, and in particular Chapter 19 and Figure 19.1, as an invalidity reference. As to pages 38 and 90 of the opening statement, I would just encourage the Court to read pages 38, 89, and 90, and you will see that Mr. Johnson was explaining that the primary way he was going to show that this was something used by others was through the Erickson textbook. It was not an explanation of poverty primarily. On the trade secrets, the fundamental problem is there's no link between MPS's supposed examination of the transformers and the damages. Mr. Buscemi is talking solely about some testimonies. But he's saying that there was testimony that it was used, that it contributed to the acceleration of their work, no? No, no, because MPS had no transformer. MPS doesn't make transformers. It doesn't sell transformers. The only thing MPS ever does is put a board together and show customers the board. Were they designing them for their customers? No, the customers are the board makers. They pick the transformer and the chip to put together, so Ambit or Sumida would pick which transformer to go with which chip and then pass it on to Dell. But it wasn't their testimony that it helped them in their relations with the customers, no? No, no, no. In fact, let me address that directly, because I think this all relates to the Ambit issue. What the testimony, actually, the documentary evidence showed was that Ambit sent an email to MPS on October 3, 2000, saying we just looked at the new O2 module, and in some ways it's better than yours. What do you think, essentially? They were concerned. And the testimony was that MPS sent its Taiwanese representative down to Ambit and dealt with them, talked to them a little bit about the way you can improve their transformer, which was a DARFON transformer, not a Sumida transformer. There was no evidence that MPS had any board at the time that would have known O2's trade secret. All they had at that point was simply some test data saying maybe the O2 solution might be better. But we couldn't have given them the trade secret because we didn't have it at the time. The only thing we had was the test data and a data sheet, and according to O2 itself, that's not going to tell you anything. You need to look at the transformer itself. So you would think that there were going to be any evidence. They would have brought on a customer and shown that Ambit or somebody else actually had a board. Sumida, for example, has been in litigation with both MPS and O2 for years. You'd think they could show a board from one of those customers that used O2's trade secret. They couldn't. Dr. Rickson admitted that he couldn't. I think you've answered the question. Thank you, Your Honor. We thank you both. We'll take the appeal under advisement.